UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------------X
                                               :

MAHMOUD KHALIL,                         :

                            Petitioner,        :

                         :                25-CV-1935 (JMF)

          -v-                   :

                         :              <u>OPINION AND ORDER</u>

WILLIAM P. JOYCE et al.,          :

                         :

                     Respondents.    :

                         :
------------------------------------------------------------------------X

JESSE M. FURMAN, United States District Judge:

At the heart of this case is the important question of whether and under what circumstances the Government may rescind a person's lawful permanent resident status and remove him from the United States. It is raised by way of a petition for the writ of habeas corpus, pursuant to 28 U.S.C. § 2241, that was filed on behalf of Mahmoud Khalil, a graduate student at Columbia University. On March 8, 2025, immigration authorities arrested and detained Khalil, a green card holder and the husband of a United States citizen, based on a determination by the Secretary of State of the United States that his "presence or activities in the United States . . . would have potentially serious adverse foreign policy consequences for the United States." 8 U.S.C. § 1227(a)(4)(C)(i). In his Petition, Khalil alleges that the Secretary of State made this determination to "retaliate against and punish" him for his "participation in protests" on and around Columbia's campus "concerning Israel's military campaign in Gaza." ECF No. 38 ("Petition"), ¶¶ 2-3. He argues that his arrest, detention, and prospective removal violate his First Amendment right to freedom of speech, his Fifth Amendment right to due process of law, as well as the Administrative Procedure Act, 5 U.S.C. § 706(2). Petition ¶¶ 88-

99.  He seeks an order directing his release from detention and setting aside the Secretary of State's determination.  *See id.* at Prayer for Relief ¶¶ 2-3, 5-6.

These are serious allegations and arguments that, no doubt, warrant careful review by a court of law; the fundamental constitutional principle that all persons in the United States are entitled to due process of law demands no less.[1]  But before the Court may review Khalil's allegations and arguments, it must confront a threshold question: whether it is the proper tribunal to even consider Khalil's Petition.  Generally, a person challenging his detention through a habeas petition is required to file that petition in the federal district where he is detained at the time of filing and to name as the respondent the custodian detaining him there.  The Supreme Court articulated and applied these "longstanding" rules — known as the "district of confinement" and "immediate custodian" rules — in a case that could be described as even more extraordinary than this one: a habeas petition filed on behalf of Jose Padilla, a United States citizen who was designated an "enemy combatant" and detained by the military.  *See Rumsfeld v. Padilla*, 542 U.S. 426, 449 (2004).  Lower courts, including this Court, have since held that these rules apply to habeas petitions filed by people held in immigration detention, such as Khalil, at least to the extent that they seek release.  Relying on the district-of-confinement and immediate-custodian rules, the Government moves to dismiss Khalil's Petition or to transfer it to the Western District of Louisiana, where he was taken by the Government on March 10, 2025, and has since been detained.  By contrast, Khalil argues that this Court should hear his Petition; in

---

[1]     In many instances, a person who argues that the Government's efforts to remove him from the United States are unlawful must await entry of a final order of removal and then file in the appropriate court of appeals a petition for review of that order.  *See, e.g., Michalski v. Decker*, 279 F. Supp. 3d 487, 492-95 (S.D.N.Y. 2018); *Yearwood v. Barr*, 391 F. Supp. 3d 255, 262-63 (S.D.N.Y. 2019).  The Court need not and does not address whether that is the route that Khalil must take to raise the claims that he brings in his petition here.

the alternative, he argues that it should be transferred to the District of New Jersey, where he was detained at the time that his lawyer filed the Petition, not to the Western District of Louisiana.

For the reasons set forth below, the Court agrees with the Government that Khalil's Petition cannot be heard in this District and agrees with Khalil that it should be transferred to the District of New Jersey, not dismissed or transferred to the Western District of Louisiana. These conclusions flow from the undisputed fact that, at 4:40 a.m. on March 9, 2025, when Khalil's lawyer filed the Petition on his behalf, he was detained in New Jersey. A straightforward application of the district-of-confinement and immediate-custodian rules therefore dictates that Khalil's Petition should have been filed in the United States District Court for the District of New Jersey, not in this Court. Khalil makes various arguments in an effort to avoid that conclusion, most notably seizing on a concurring opinion in *Padilla*, in which Justice Anthony M. Kennedy, joined by Justice Sandra Day O'Connor, observed that he "would acknowledge an exception" to the district-of-confinement and immediate-custodian rules "if there is an indication that the Government's purpose in removing a prisoner were to make it difficult for his lawyer to know where the habeas petition should be filed, or where the Government was not forthcoming with respect to the identity of the custodian and the place of detention." 542 U.S. at 454 (Kennedy, J., concurring). But it is not clear that Justice Kennedy's opinion is the law of the land; nor has any court ever found that his exceptions applied. In any event, even if Justice Kennedy's exceptions were the law (or the Court were to adopt them), they would not aid Khalil. That is because he has not alleged facts indicating that his transfer from this District to the District of New Jersey — the only transfer relevant to the jurisdictional analysis — was done for an improper purpose or that the Government was not forthcoming about his whereabouts in a way that meaningfully affected his ability to seek, let alone obtain, judicial review of his detention.

3

For these reasons, elaborated upon below, the Court concludes that it may not entertain Khalil's Petition. But the Court rejects the Government's requests to dismiss the case or to transfer it to the Western District of Louisiana. As to the former, transfer, rather than dismissal, is the path that courts usually take in these circumstances. That path is all the more appropriate in this case, as dismissal would mean vacatur of this Court's order barring Khalil's removal from the United States until his claims can be addressed, *see* ECF No. 9, and thus might allow the Government to frustrate Khalil's effort to obtain judicial review of his claims by removing him from the country before a court could rule. Moreover, Khalil filed in the wrong district through no fault of his own; his lawyer reasonably relied on the information made available to her by the Government at the time of filing. As to the latter, the Court concludes that a straightforward application of well-established federal law mandates transfer of the case to the District of New Jersey because, under the immediate-custodian and district-of-confinement rules, it is the one and only district in which Khalil could have filed his Petition at the time this action commenced. Congress has prescribed the district to which this case must be transferred, and it is New Jersey. The Court is no less bound by these laws to transfer to the District of New Jersey than it is bound by the immediate-custodian and district-of-confinement rules to decline jurisdiction.

In many ways, this is indeed an exceptional case, and there is a need for careful judicial review. Such judicial review is especially critical when, as here, there are colorable claims that the Executive Branch has violated the law or exercised its otherwise lawful authority in an arbitrary and discriminatory manner. *See Marbury v. Madison*, 5 U.S. 137, 177 (1803) ("It is emphatically the province and duty of the judicial department to say what the law is."). But the Supreme Court has made clear that the "longstanding" immediate-custodian and district-of-confinement rules apply without regard for whether a case is "'exceptional,' 'special,' or 'unusual.'" *Padilla*, 542 U.S. at 449-50. And in an exceptional case, it is all the more important

for a court to apply well-established principles to the facts, lest emotions or passions interfere with reasoned analysis; that is the essence of the rule of law. For the reasons that follow, the Court concludes that well-established principles call for this Court to transfer Khalil's Petition to the United States District Court for the District of New Jersey, and the Court orders that the case be so transferred forthwith. To preserve the status quo and ensure that Khalil gets an opportunity to have his claims heard in due course, the Court's Order barring the Government from removing Khalil, *see* ECF No. 9, shall remain in effect unless and until the transferee court orders otherwise. It will be up to that court to consider Khalil's claims as well as the motions that he has filed to date in connection with his claims, namely a motion to transfer him from his present place of confinement to a detention facility in this District, ECF No. 11; a motion for release on bail, ECF No. 53; and a motion for preliminary injunctive relief, ECF No. 66.

## RELEVANT FACTS

Many of the facts in this case are hotly contested. For instance, the Petition depicts Khalil — who entered the United States in December 2022 on a student visa to attend Columbia University's School of International and Public Affairs, is married to a United States citizen, and has been a lawful permanent resident since 2024 — as an outspoken but peaceful leader of student protests held at Columbia University against Israel's actions in Gaza since the atrocities of October 7, 2023. Petition ¶¶ 20-29. By contrast, the Government has issued statements describing Khalil as leading "activities aligned to Hamas," "siding with terrorists," and a "threat to the foreign policy and national interests of the United States." *Id.* ¶¶ 74, 76-77, 79. More significant for present purposes, the Secretary of State has made a formal finding that Khalil's "presence or activities in the United States would have serious adverse foreign policy consequences for the United States," *id.* ¶ 82; *see also* ECF No. 48, at 7 (Notice to Appear), and,

on that basis, the Government apparently canceled Khalil's green card and now seeks his removal from the United States, *see* 8 U.S.C. § 1227(a)(4)(C)(i).

Significantly, however, the facts relevant to the threshold question of where this case should be heard — all of which relate to events between March 8 and 10, 2025 — are not really in dispute. On March 8, 2025, at approximately 8:30 p.m., agents from the United States Department of Homeland Security ("DHS") arrested Khalil outside his Columbia University apartment in New York City. Petition ¶¶ 45-48; ECF No. 48 ("Mar. 14, 2025 Joyce Decl."), ¶ 7. The agents approached Khalil and his wife and asked him to confirm his identity. Petition ¶ 47. When he did, the agents identified themselves as DHS agents and declared that they were taking him into custody. *Id.* Khalil asked why the agents were there, to which they replied that Khalil's visa had been revoked. *Id.* ¶ 48. Khalil then called his attorney, Amy Greer, who spoke with one of the agents present — Special Agent Elvin Hernandez — and explained that Khalil is a lawful permanent resident. *Id.* ¶¶ 49-51. Hernandez responded that the State Department had also revoked Khalil's green card and that he would be brought before an immigration judge. *Id.* ¶ 51.[2] The agents handcuffed Khalil, then informed his wife and lawyer that they were taking him to 26 Federal Plaza, the Immigration and Customs Enforcement ("ICE") Field Office in Manhattan. *Id.* ¶¶ 51-53. They proceeded to take him there, arriving at 9:20 p.m. *Id.* ¶ 58; Mar. 14, 2025 Joyce Decl. ¶ 7.

Once Khalil arrived at 26 Federal Plaza, ICE agents took his biometrics. Petition ¶ 58. While there, Khalil overheard an agent say to Agent Hernandez that "the White House is

---

[2]    The Petition alleges that when Khalil's wife presented to one of the DHS agents documents "confirming Mr. Khalil's status as a lawful permanent resident," the agent "looked confused" and said to someone on the telephone: "'He has a green card.'" Petition ¶ 52. Khalil's wife then "heard the agent repeat that they were being ordered to bring Mr. Khalil anyway." *Id.*

requesting an update." *Id.*  Khalil was then asked to sign a Notice to Appear ("NTA") for removal proceedings, a document that provides notice of the grounds for a noncitizen's removal from the country, and a Notice of Custody Determination, a document that provides notice of the grounds for a noncitizen's detention during removal proceedings. *Id.* ¶ 59; Mar. 14, 2025 Joyce Decl. ¶ 7.  The Notice to Appear ordered Khalil to appear before an immigration judge at "830 Pinehill Rd, Jena, LA, 71342, LASALLE DETENTION FACILITY on March 27, 2025 at 8:30 AM."  Petition ¶ 60; *see* ECF No. 48, at 7.  The document was dated March 9, 2025, and the issuing officer's signature was timestamped at 12:40 a.m.  Petition ¶ 60; *see* ECF No. 48, at 7-8.  An ICE agent denied Khalil's request to speak with his lawyer about the Notice to Appear and the Notice of Custody Determination, and Khalil refused to sign the documents.  Petition ¶ 59.

In the meantime, Greer began checking ICE's online Detainee Locator in an effort to locate Khalil.  She first did so at 10:00 p.m. on March 8, 2025, but Khalil was not yet listed in the system. *Id.* ¶ 54.  She checked the Detainee Locator again at 1:35 a.m. on Sunday, March 9, 2025, at which time Khalil was listed as being in custody in New York. *Id.*  At 4:29 a.m., Greer checked the Detainee Locator again and observed that Khalil was still listed as being in New York. *Id.*[3]  Eleven minutes later, at 4:40 a.m., Greer filed the Petition on Khalil's behalf; she filed it in this District "based on information and belief that ICE was still holding Mr. Khalil at 26 Federal Plaza" (which is located in this District). *Id.*; *see also* ECF No. 2.  The Petition named as Respondents William P. Joyce, the Acting Field Office Director of the New York Field Office for ICE; Caleb Vitello, the Acting Director of ICE; Kristi Noem, the Secretary of DHS; and Pamela Bondi, the Attorney General of the United States. *See* ECF No. 2, ¶¶ 2-5.  (The Petition has since been amended to name two additional Respondents, Donald J. Trump, the

---

[3]     Although it is immaterial for present purposes, the Court notes that, on March 9, 2025, at 2:00 a.m. (Eastern Standard Time), the time changed to 3:00 a.m. (Eastern Daylight Time).

President of the United States; and Marco Rubio; the Secretary of State, and is now styled "Amended Petition for Writ of Habeas Corpus and Complaint." *See* Petition ¶¶ 10, 14.)

Significantly, it turns out that Khalil was no longer in the Southern District of New York when Greer filed the Petition. Declarations filed by the Government — and not disputed by Khalil — reveal that, on March 9, 2025, at 1:40 a.m. (Eastern Standard Time), ICE agents transported Khalil from 26 Federal Plaza to the Elizabeth Detention Facility in Newark, New Jersey, into which he was booked at 3:20 a.m. (Eastern Daylight Time — i.e., forty minutes after leaving 26 Federal Plaza). *See e.g.*, Mar. 14, 2025 Joyce Decl. ¶ 14; *see* ECF No. 32 ("Mar. 12, 2025 Joyce Decl."), ¶ 8. According to the Government, 26 Federal Plaza is a "Hold Room facility" used only for temporary detention and "does not have beds or overnight medical staff." Mar. 14, 2025 Joyce Decl. ¶ 13. Further, ICE policy provides that, "absent exceptional circumstances, no detainee should be housed in a Hold Room facility for longer than 12 hours." *Id.* (discussing ICE ERO policy number 11087.2). "In compliance with this policy," ICE transported Khalil from 26 Federal Plaza to the Elizabeth Detention Facility. *Id.* ¶ 14. The Government explains this move on the ground that, "[d]ue to a lack of detention space available" to ICE's New York Field Office, noncitizens arrested by ICE in the New York City area are frequently detained at facilities located elsewhere. *Id.* ¶ 8. It further explains that the Orange County Jail, which is located in this District, "did not have available detention space." *Id.* ¶ 9.

Although Khalil had left New York by 3:20 a.m. on March 9, 2025, the ICE Detainee Locator was not updated until later that morning. *See* Petition ¶ 55 ("The next morning, around 8:30 a.m. on Sunday, March 9, the ICE locator indicated that Mr. Khalil was still in New York."). "Sometime after 9 a.m." that day, the Detainee Locator changed to say — accurately — that he was detained at the Elizabeth Detention Facility in New Jersey. *Id.* At 9:29 a.m., Khalil's immigration attorney twice attempted to call the Elizabeth Detention Facility, but no one

answered.  *Id.*  At around 11:20 a.m. the same day, Khalil's wife went to the Elizabeth Detention Facility to see him, but she was informed that Khalil was not showing up in the system.  *Id.*

At 11:30 a.m., agents removed Khalil from the Elizabeth Detention Facility to take him to the Central Louisiana ICE Processing Facility (also known as the LaSalle Detention Facility) located in Jena, Louisiana, where his removal hearing was noticed to occur on March 27, 2025. Mar. 14, 2025 Joyce Decl. ¶¶ 16-17; *see* Petition ¶ 60; ECF No. 48, at 7.  The Government explains that the Elizabeth Detention Facility "was experiencing and continues to experience a bedbug issue that prevented [the facility] from accepting detainees as full transfers."  Mar. 14, 2025 Joyce Decl. ¶ 11.  Therefore, even before Khalil was moved from 26 Federal Plaza to the Elizabeth Detention Facility, the New York ICE office had requested and secured bedspace for Khalil from the New Orleans ICE Field Office and began arranging a flight to transport him there at 2:35 p.m. on March 9, 2025.  *Id.* ¶ 12; ECF No. 72 ("Mar. 17, 2025 Joyce Decl."), ¶ 12.[4] The Government maintains that the New York Field Office "was responsible for locating bed space to detain Khalil," that it "did not receive any directives or instructions pertaining to Khalil's detention," and that it "made its decisions on where to detain him based solely on operational considerations."  Mar. 17, 2025 Joyce Decl. ¶¶ 13-14.

Around noon on March 9, 2025, agents took Khalil to John F. Kennedy Airport in the Eastern District of New York (presumably passing back through the Southern District of New York en route).  Mar. 14, 2025 Joyce Decl. ¶ 16; *see* Petition ¶ 63.  At 1:22 p.m., Khalil's counsel emailed ICE in an effort to reach him; at 1:47 p.m., ICE responded — truthfully — by

---

[4]    The Government represents that Khalil was one of sixteen detained noncitizens transported from the New York Field Office's area of responsibility to the New Orleans Field Office's area of responsibility between March 8, 2025, and March 9, 2025.  Mar. 14, 2025 Joyce Decl. ¶ 10.  Most of these transfers were for ongoing detention, as with Khalil, while a "small number" were moved there in preparation for removal from the country.  *Id.*

email that Khalil was in the process of being transferred to a detention facility within the New

Orleans ICE Field Office's area of responsibility.  Petition ¶ 56.  Khalil's counsel then contacted

the U.S. Attorney's Office for the Southern District of New York, which confirmed that Khalil

was en route to Louisiana.  *Id.*  Meanwhile, at John F. Kennedy Airport, Khalil boarded a flight

at around 2:45 p.m. that brought him to Dallas, Texas, in the Northern District of Texas.  *See id.*

¶ 65.  From there, Khalil was placed on another flight at around 9:30 p.m., which landed in

Alexandria, Louisiana, in the Western District of Louisiana, at around 1:00 a.m. on March 10,

2025.  *Id.* ¶¶ 66-67.  From there, agents drove Khalil to the Louisiana Detention Facility in Jena,

Louisiana, in the Western District of Louisiana, into which he was booked at 1:33 a.m. on March

10, 2025.  *Id.* ¶¶ 67, 70; Mar. 14, 2025 Joyce Decl. ¶ 17.  He remains there today.  Mar. 17, 2025

Joyce Decl. ¶ 19.  The Government represents that "ICE has no current plans or intentions to

transfer Khalil from [that facility] during the pendency of removal proceedings."  *Id.*

## DISCUSSION

The "merits of this case" — involving, among other things, the rights of a person

lawfully present in the United States to the protections of the First and Fifth Amendments to the

United States Constitution — are "indisputably of profound importance."  *Padilla,* 542 U.S. at

450 (internal quotation marks omitted).  As the Supreme Court has admonished, however, "it is

surely just as necessary in important cases as in unimportant ones that courts take care not to

exceed their respective jurisdictions established by Congress."  *Id.* at 450-51 (internal quotation

marks omitted).  Thus, before the Court may address the merits of Khalil's important claims, it

must address the Government's contention — made in a motion to dismiss or transfer Khalil's

Petition — that it is not the proper tribunal to hear those claims.  For reasons that follow, the

Court agrees with the Government that it may not entertain the merits of Khalil's Petition, and it

agrees with Khalil that the proper course is to transfer the Petition to the District of New Jersey.

### A. This Court Lacks Jurisdiction to Consider Khalil's Petition

The Court begins with the central question of whether it may entertain Khalil's Petition given the undisputed fact that he was not in this District when his lawyer filed the Petition.

### 1. Applicable Law

The starting point for analysis is *Rumsfeld v. Padilla*, the Supreme Court's most recent and most relevant decision on the question of where a habeas petition can be heard. *Padilla* involved a United States citizen who was initially detained in the Southern District of New York on a material witness warrant (in connection with a grand jury investigation into the September 11th terrorist attacks), but then transferred into military custody in Charleston, South Carolina upon being designated by President George W. Bush as an "enemy combatant." 542 U.S. at 430. Two days after his transfer to South Carolina, Padilla's lawyer filed a habeas petition, pursuant to 28 U.S.C. § 2241, in the Southern District of New York, naming as respondents the President, the Secretary of Defense, and the Commander of the Consolidated Naval Brig in Charleston, where Padilla was then detained. *Id.* at 432. The Supreme Court granted certiorari to consider, among other things, whether Padilla properly filed his habeas petition in this District. *Id.* at 434. That question, the Court concluded, "br[oke] down into two related subquestions": first, who the proper respondent was for Padilla's petition, and second, where his petition seeking relief against that respondent should have been filed. *Id.*

As to the former, the Supreme Court concluded that both the statutory language of the federal habeas statute and its previous decision in *Wales v. Whitney*, 114 U.S. 564 (1885), confirmed the "longstanding practice" that in a "core" habeas petition challenging "present physical confinement," the proper respondent is the "the warden of the facility where the petitioner is being held," not a "remote supervisory official." *Padilla*, 542 U.S. at 435. The Court called this the "immediate custodian rule." *Id.* In reaching that conclusion, the Supreme

Court rejected the petitioner's argument that its decision in *Ex parte Endo*, 323 U.S. 283 (1944), called for a contrary result.  In *Endo*, the Supreme Court had allowed a habeas petition by a Japanese-American citizen originally interned in California to proceed against the official responsible for her custody in California, even after she was transferred to Utah.  *Padilla*, 542 U.S. at 440.  According to the *Padilla* Court, *Endo* stood only "for the important but limited proposition" that a petitioner's relocation after a "properly file[d]" habeas petition does not deprive a district court of jurisdiction.  *Id*. at 441.

As to the latter subquestion, the Court looked again to the "plain language" of the federal habeas statute — which limits district courts to granting relief "within their respective jurisdictions," 28 U.S.C. § 2241 — to conclude that a habeas petition naming a prisoner's custodian can be filed in only one district: "the district of confinement."  542 U.S. at 442 (internal quotation marks omitted).  "The proviso that district courts may issue the writ only 'within their respective jurisdictions,'" the Court reasoned, "forms an important corollary to the immediate custodian rule in challenges to present physical custody under § 2241.  Together they compose a simple rule that has been consistently applied in the lower courts . . . : Whenever a § 2241 habeas petitioner seeks to challenge his present physical custody within the United States, he should name his warden as respondent and file the petition in the district of confinement."  *Id.* at 447-48.  This "simple rule," the Court continued, "serves the important purpose of preventing forum shopping by habeas petitioners" as well as "district courts with overlapping jurisdiction."  *Id.* at 447.

Applying the immediate-custodian and district-of-confinement rules, the Supreme Court concluded that Padilla's petition could not be heard in the Southern District of New York.  Notably, the Court rejected Padilla's "request for a new exception" to these rules "based upon the 'unique facts' of [the] case."  *Id.* at 441.  The Court rightly acknowledged that Padilla's

detention was "undeniably unique in many respects" but declared that, "at bottom," it was "a simple challenge to physical custody imposed by the Executive — the traditional core of the Great Writ.  There is no indication that there was any attempt to manipulate behind Padilla's transfer . . . , and the Government did not attempt to hide from Padilla's lawyer where it had taken him."  *Id.*  Later in its opinion, the majority explicitly rejected the dissent's view that the Court had previously "made various exceptions to the immediate custodian and district of confinement rules whenever 'exceptional,' 'special,' or 'unusual' cases have arisen."  *Id.* at 448.  If the dissent's "view were accepted," the majority explained, "district courts would be consigned to making ad hoc determinations as to whether the circumstances of a given case are 'exceptional,' 'special,' or 'unusual' enough to require departure from the jurisdictional rules this Court has consistently applied.  We do not think Congress intended such a result."  *Id.* at 450.

The majority opinion in *Padilla* was joined by five Justices.  But one of those Justices, Justice Kennedy, filed a concurring opinion, joined by Justice O'Connor, to make two points.  First, he noted that the rules governing habeas jurisdiction "are not jurisdictional in the sense of a limitation on subject-matter jurisdiction" and instead implicate questions of "personal jurisdiction or venue."  *Padilla*, 542 U.S. at 451 (Kennedy, J., concurring).  That means both that objections to petitions on those grounds "can be waived by the Government" and that the rules themselves are "subject to exceptions."  *Id.* at 452.  Second, Justice Kennedy wrote that he "would acknowledge an exception" to the immediate-custodian and district-of-confinement rules "if there is an indication that the Government's purpose in removing a prisoner were to make it difficult for his lawyer to know where the habeas petition should be filed, or where the Government was not forthcoming with respect to the identity of the custodian and the place of detention."  *Id.* at 454.  If, for example, "the Government had removed Padilla from the Southern District of New York but refused to tell his lawyer where he had been taken," Justice Kennedy

would have concluded that the Southern District of New York "had jurisdiction over the petition. Or, if the Government did inform the lawyer where a prisoner was being taken but kept moving him so a filing could not catch up to the prisoner, again, in [his] view, habeas jurisdiction would lie in the district or districts from which he had been removed." *Id.*

The *Padilla* Court explicitly reserved judgment on whether the immediate-custodian rule applies in the immigration context, *see id.* at 435 n.8, and the Second Circuit has not decided the issue either, *see Henderson v. I.N.S.*, 157 F.3d 106, 128 (2d Cir. 1998). In the years since, however, "a clear majority of courts in this circuit" — including *this* Court, on at least five separate occasions — "have held that the 'immediate custodian' rule applies" to "core" immigration habeas cases in which a petitioner challenges his or her detention pending removal "and that jurisdiction [in such cases] lies only in the district of confinement." *Singh v. Holder*, No. 12-CV-4731 (JMF), 2012 WL 5878677, at *2 (S.D.N.Y. Nov. 21, 2012) (internal quotation marks omitted) (collecting cases); *see Suraiya v. Cioppa*, No. 18-CV-6628 (JMF), ECF No. 18 (S.D.N.Y. Aug. 6, 2018); *Thomas v. Decker*, No. 19-CV-8690 (JMF), ECF No. 26 (S.D.N.Y. Oct. 17, 2019); *Tazu v. Barr*, No. 19-CV-1716 (JMF), ECF No. 16 (S.D.N.Y. Mar. 1, 2019); *Traore v. Decker*, No. 18-CV-7909 (JMF), ECF No. 9 (S.D.N.Y. Sept. 13, 2018); *see also Andoh v. Barr*, No. 19-CV-8016 (PAE), 2019 WL 4511623, at *2 (S.D.N.Y. Sept. 18, 2019) ("The substantial majority of judges in this District to consider this question have reached the same conclusion, holding that a defendant detained in New Jersey who seeks to challenge his detention, even if under the supervision of ICE personnel in this District, must bring a habeas action in the District of New Jersey." (citing *Almazo v. Decker*, No. 18-CV-9941 (PAE), 2018 WL 5919523, at *1 (S.D.N.Y. Nov. 13, 2018) (collecting cases))). By contrast, courts have generally held that for "non-core" habeas proceedings — for example, proceedings in which a

petitioner seeks "a stay of deportation or an adjustment of status" — jurisdiction can be proper outside the district of confinement.  *Singh*, 2012 WL 5878677, at *2 (citing cases).

## 2.  Analysis

As Khalil was in New Jersey when his lawyer filed the Petition here, this Court would plainly lack jurisdiction if the immediate-custodian and district-of-confinement rules apply in the normal course.  Khalil presses three arguments to avoid that conclusion, but none of his arguments are persuasive.  The first two can be swiftly rejected.  First, citing the fact that the Supreme Court and the Second Circuit have not addressed whether the immediate-custodian rule applies in the immigration habeas context, Khalil contends that Joyce, the Acting Field Director of the ICE New York Field Office, was his "immediate custodian" at the time of filing because Joyce "took and never relinquished custody over Mr. Khalil" until he arrived in Louisiana.  ECF No. 50 ("Pet.'s Opp'n"), at 12.  But this Court does not write on a clean slate.  As noted above, joining "a substantial majority" of judges in this District, *Andoh,* 2019 WL 4511623, at *2, it has rejected this exact legal argument no fewer than five times.  It is a fundamental rule-of-law principle that like cases must be treated alike.  *See Pepper v. United States*, 562 U.S. 476, 510 (2011) (Breyer, J., concurring in part and concurring in the judgment) ("A just legal system seeks not only to treat different cases differently but also to treat like cases alike.").  That principle requires that the Court adhere to its prior conclusion here, even if the underlying circumstances of this case may be more unusual and more troubling than those in its prior cases.  Put simply, those underlying circumstances are not relevant to the purely legal question of whether, as a general matter, the immediate-custodian rule applies to immigration habeas petitions.

Second, Khalil argues that application of the immediate-custodian and district-of-confinement rules is inappropriate because his Petition asserts both "core" and "non-core" habeas claims.  *See* Pet.'s Opp'n 16-17.  True, in addition to seeking release from detention, he

seeks injunctive and declaratory relief with respect to the Secretary of State's determinations that led to his detention and removal proceedings. *See, e.g.*, *S.N.C. v. Sessions*, 325 F. Supp. 3d 401, 406-07 (S.D.N.Y. 2018) (stating that "challenges to immigration-based detention" are "'core' immigration-based habeas challenges" but "challenges to forms of custody other than physical confinement, such as orders of removal" are not).  In support of this argument, Khalil relies on *Calderon v. Sessions*, 330 F. Supp. 3d 944 (S.D.N.Y. 2018), in which a judge of this Court held that a district court may adjudicate "core" habeas claims even where the immediate-custodian and district-of-confinement rules point elsewhere if the petition's accompanying "non-core" claims "predominate," *id.* at 952.  As Khalil all but acknowledges, however, *Calderon* is an outlier.  *See* Pet.'s Opp'n 17 n.5.  Most courts have correctly concluded that its approach "run[s] afoul of *Padilla*'s . . . rule: that 'core' claims must be brought in the district that has territorial jurisdiction over the custodian of the petitioner's present physical detention."  *S.N.C.*, 325 F. Supp. 3d at 409; *see, e.g.*, *Sow v. Whitaker*, 18-CV-11394 (GBD) (RWL), 2019 WL 2023752, at *4 (S.D.N.Y. May 8, 2019) (citing cases).  "When faced with a 'mixed' petition," these courts have held, "the approach most faithful to *Padilla*" is to order transfer "to the district that has *both* (a) territorial jurisdiction over the immediate custodian and (b) venue and personal jurisdiction over the legal custodian."  *S.N.C.*, 325 F. Supp. 3d at 409 (emphasis added).

In any event, Khalil's "mixed petition" argument would almost certainly fail for either of two other reasons as well.  First, all of his claims, at bottom, present a challenge to his detention.  That is, Khalil seeks to vacate and set aside the Secretary of State's determination that his "presence or activities in the United States" would have "potentially serious foreign policy consequences for the United States" and seeks to enjoin Respondents' allegedly "unlawful Policy of targeting noncitizens for removal based on First Amendment protected speech."  Petition ¶ 2; *id.* at Prayer for Relief, ¶¶ 2-3.  But if the Court were to grant this relief, it would necessarily

require Khalil's release because without the Secretary of State's determination, Khalil would still be a lawful permanent resident and, as the Government concedes, he could not then "be detained." ECF No. 71 ("Gov't Reply"), at 9 n.6 (citing 8 U.S.C. § 1226(a), which only authorizes "detention pending removal proceedings"). Thus, Khalil's challenges to the revocation of his lawful permanent residence status are "unavoidably a challenge to [his] detention" and, in the circumstances here, likely "core" claims themselves. *Andoh*, 2019 WL 4511623, at *3. And second, even if Khalil's Petition is construed to bring "non-core" claims, it does not follow that they should be heard here. Instead, as discussed below, the Court would, in that instance, exercise its discretion to ensure that such claims are heard by a court that, unlike this Court, has the authority to consider Khalil's entire Petition.

Khalil's final argument — which relies on Justice Kennedy's concurrence in *Padilla* — is perhaps his most compelling, but it too falls short. *See* Pet.'s Opp'n 7-12. For one thing, it is far from clear that Justice Kennedy's opinion is the law of the land. The majority opinion in *Padilla* "enjoy[ed] the assent of five Justices" — including Justices Kennedy and O'Connor — which means that Justice Kennedy's concurrence cannot be construed as "the holding of the Court." *Marks v. United States*, 430 U.S. 188, 193 (1977). And the majority opinion itself referred to Justice Kennedy's proffered "exceptions" to the immediate-custodian rule as only "proposed," not "recognized." 542 U.S. at 435-36 ("No exceptions to this rule, either recognized or proposed, *see post* at 454 (KENNEDY, J., concurring), apply here." (footnote omitted)). Since *Padilla*, a smattering of district courts have cited Justice Kennedy's opinion, some as if it were binding law. *See, e.g.*, *Salcedo v. Decker*, No. 18-CV-8801 (RA), 2019 WL 339642, at *2 n.3 (S.D.N.Y. Jan. 18, 2019); *Sow*, 2019 WL 2023752, at *5; *Redding v. Thompson*, No. 17-CV-2740, 2018 WL 850147, at *6 (D. Minn. Jan. 23, 2018); *Xia v. King*, No. 24-cv-2000, 2025 WL 240792, at *2 (D. Minn. Jan 17, 2025); *Russell v. Bureau of Prisons*, No. 20-CV-1082, 2021 WL

7208910, at *4 n.5 (E.D. Ark. Sept. 27, 2021); *Vidal-Martinez v. Prim*, No. 20-CV-5099, 2020 WL 6441341, at *5 n.6 (N.D. Ill. Nov. 3, 2020); *see also Fuentes v. Choate*, No. 24-CV-1377 (NYW), 2024 WL 2978285, at *8 (D. Colo. June 13, 2024) (describing Justice Kennedy as having "proposed" exceptions to the immediate-custodian rule).  But Khalil does not cite, and the Court has not found, a single example of Justice Kennedy's opinion being applied to award relief.  From the get-go, then, Khalil's final argument rests on a shaky foundation.

Ultimately, however, the Court need not and does not decide whether Justice Kennedy's exceptions are good law because, even if they are, Khalil's attempts to invoke them fall short. Critically, in determining whether Justice Kennedy's exceptions would apply, the proper focus of the analysis is on the one and only transfer of Khalil with jurisdictional relevance: his transfer from 26 Federal Plaza in this District to the Elizabeth Detention Facility in the District of New Jersey.  After all, it was the Government's transfer and detention of Khalil there in the hours before Khalil's lawyer filed the Petition that, under the "longstanding" rules reaffirmed in *Padilla*, would make this Court an improper forum to adjudicate his claims.  542 U.S. at 449.  In other words, in considering the applicability of Justice Kennedy's proposed exceptions, the central questions are whether (1) "there is an indication that the Government's purpose in removing" Khalil from this District to the District of New Jersey was "to make it difficult for his lawyer to know where the habeas petition should be filed" and (2) whether, at the time of filing, "the Government was not forthcoming with respect to the identity of the custodian and the place of detention."  *Id.* at 454 (Kennedy, J., concurring).  The circumstances surrounding Khalil's later transfer to Louisiana, which post-dated the filing of his Petition, may shed some light on these questions, but they are ultimately secondary to the relevant legal analysis.

First, Khalil does not allege any facts giving rise to the plausible inference that the Government's "purpose" in moving him to New Jersey was "to make it difficult for his lawyer to

know where the habeas petition should be filed." *Id.* At the outset, this Court can attest from its own experience that noncitizens arrested and detained by immigration authorities in New York City are routinely processed at 26 Federal Plaza and then transferred to New Jersey for detention. *See, e.g.*, *see Suraiya*, No. 18-CV-6628 (JMF), ECF No. 17; *Thomas*, No. 19-CV-8690 (JMF), ECF No. 26; *Tazu*, No. 19-CV-1716 (JMF), ECF No. 14; *Traore*, No. 18-CV-7909 (JMF), ECF No. 9. That experience is far from anomalous. *See e.g., Abraham v. Decker*, 18-CV-3481 (CBA), 2018 WL 3387695, at *1 (E.D.N.Y. July 12, 2018) (petitioner arrested in Brooklyn, charged as removable at 26 Federal Plaza, then transferred to a New Jersey detention facility); *Xiu Qing You v. Nielsen*, No. 18-CV-5392 (GBD) (SN), 2020 WL 2837022, at *2 (S.D.N.Y. June 1, 2020) (petitioner arrested in Manhattan, held initially at 26 Federal Plaza, then transferred "[a]fter hours of waiting" to a New Jersey detention facility); *Montrevil v. Decker*, 20-CV-264 (WFK) (LB), 2021 WL 11690690, at *1 (E.D.N.Y. July 19, 2021) (petitioner arrested in Queens, held at 26 Federal Plaza "for several hours," then transferred to a New Jersey detention facility); *Sow*, 2019 WL 2023752, at *1 (petitioner arrested at his home, brought to 26 Federal Plaza, then moved "[l]ater that same day or evening" to New Jersey detention facility).

Against this backdrop, the Court cannot conclude that the Government's transfer of Khalil from New York to New Jersey was done to prevent his lawyer from promptly challenging his detention in federal court. Khalil's lawyers do not allege that they were prepared to file the Petition any earlier than 4:40 a.m. And, within a matter of hours, the Government did truthfully disclose Khalil's whereabouts, first via the online Detainee Locator "[s]ometime after 9 a.m.," Petition ¶ 55, and later that afternoon in communications with Khalil's counsel, *see id.* ¶ 56. What is more, all of this took place on a Sunday between 1:40 a.m. (Eastern Standard Time) and "[s]ometime after 9 a.m." (Eastern Daylight Time) — that is, at a time when the federal courts were closed. It would have been one thing if the Government had covertly transferred Khalil at a

time when federal courts were able and ready to consider a habeas petition.  But in this case, Khalil's lawyer could not have obtained immediate relief even if she had known where he was detained at the moment she filed the Petition.  Put differently, the Government disclosed Khalil's whereabouts to his lawyer well before any federal court could or would have entertained his Petition.  Given these circumstances, there is no basis to conclude that the Government's purpose in transferring Khalil from New York to New Jersey was to frustrate the Great Writ.

That conclusion is compelling even if the Court were not to consider the Government's explanations for Khalil's transfer to New Jersey, but it is nearly inescapable if the Court does.  In sworn declarations, the Government attests that the transfer was a function of its standard operating procedures and "operational considerations."  Mar. 17, 2025 Joyce Decl. ¶ 13.  The declarations affirm that noncitizens arrested by immigration authorities in New York are "often detained at facilities in other [areas of responsibility]" due to the "lack of available detention space" in New York.  *Id.* ¶¶ 8-9.  They further explain that "ICE's facility at 26 Federal Plaza is a Hold Room facility used for detention of individuals awaiting removal, transfer, . . . intra-facility movement, or other processing into or out of a facility" and that, pursuant to ICE policy, "no detainee should be housed in a Hold Room facility for longer than 12 hours."  *Id.* ¶ 15.  For these reasons, the Government explains, Khalil was moved to the Elizabeth Detention Facility, which was equipped with "overnight accommodations for detainees such as beds and 24-hour medical staff."  *Id.* ¶ 16.  Khalil does not controvert these explanations, which are consistent with the Court's experience and the case law cited above.[5]

---

[5]    The Government invokes the "presumption of regularity" that attaches to many official acts of public officials.  Gov't Reply 6-7 & n.2 (citing *Nat'l Archives and Records Admin. v. Favish*, 541 U.S. 157, 174 (2004)).  It is not clear, however, that the presumption is appropriate here.  *See Proctor v. LeClaire*, 846 F.3d 597, 608 n.4 (2d Cir. 2017) n.4 ("While we afford prison officials wide-ranging deference in the adoption and execution of policies designed to promote institutional safety, Defendants cite no case, and we cannot find one, that applies such a

Khalil cites the Government's "movement of him across four states" to suggest ICE treated him anomalously.  Pet.'s Opp'n 10-11.  But as discussed above, the only transfer that occurred prior to the filing of the Petition — that is, the only jurisdictionally relevant transfer — was the transfer from the short-term holding facility in New York to the Elizabeth Detention Facility in New Jersey, and Khalil fails to cast doubt on the Government's explanation that this specific transfer was a function of its standard operating procedures.

In any event, considering Khalil's later transfers — on the theory that they shed light on the Government's purpose in transferring him to New Jersey in the first instance — would not warrant a different conclusion.  The practical, and unfortunate, reality is that "the Government regularly transfers detained noncitizens between facilities, often multiple times." *Garland v. Aleman Gonzalez*, 596 U.S. 543, 570 (2022) (Sotomayor, J., concurring in the judgment in part and dissenting in part); *see also Demore v. Kim*, 538 U.S. 510, 554 (2003) (Souter, J., concurring in part and dissenting in part) (explaining that immigration officials "detain, transfer, and isolate aliens away from their lawyers, witnesses, and evidence"); *see also Anariba v. Dir. Hudson Cnty. Corr. Ctr.*, 17 F.4th 434, 448 (3d Cir. 2021) (noting that "continuous transfer" can "permeate[] the reality of ICE detention").  And transfers to remote locations are routinely made without any prior notice to counsel.  *See Anariba*, 17 F.4th at 448 (discussing how "the Government often repeatedly moves ICE detainees to remote locations far from counsel or their community without informing counsel of the transfer" (internal quotation marks omitted)); *Bell v. Ashcroft*, No. 03-CV-766 (HB), 2003 WL 22358800, at *3 (S.D.N.Y. Oct. 15, 2003)

---

presumption in a constitutional challenge to state prison officials' periodic review of [Administrative Segregation].  We decline to do so today." (cleaned up)).  Moreover, "the presumption of regularity — to the extent it is not rebutted — requires a court to treat the Government's record as accurate; it does not compel a determination that the record establishes what it is offered to prove."  *Latif v. Obama*, 677 F.3d 1175, 1180-81 (D.C. Cir. 2011).  In any event, the Court need not and does not decide the issue.

(observing that "aliens in federal custody are routinely transferred . . . to other, often far-away, facilities"); *Orantes-Hernandez v. Meese*, 685 F. Supp. 1488, 1500 (C.D. Cal. 1988) ("INS follows a general practice of transferring detained class members from the place of arrest to detention centers located in remote and isolated areas."), *aff'd sub nom. Orantes-Hernandez v. Thornburgh*, 919 F.2d 549 (9th Cir. 1990). However unusual or disturbing the circumstances leading to Khalil's arrest and detention may have been, his transfers from facility to facility — and, most critically, from 26 Federal Plaza to the Elizabeth Detention Facility on March 9, 2025 — do not appear to be that unusual. They are certainly not unusual enough for the Court to disregard the "longstanding" district-of-confinement and immediate-custodian rules.

Khalil also contends that the fact that his transfers took place "rapidly" — that is, in under twenty-four hours — "means [the Government's] conduct goes even more to the core of Justice Kennedy's concerns." Pet.'s Opp'n 12. But the swift nature of Khalil's transfer does not help his argument. For one thing, rapid transfers from one immigration detention facility to another also appear to be common, *see, e.g.*, *Xiu Qing You*, 2020 WL 2837022, at *2; *Montrevil*, 2021 WL 11690690, at *1; *Sow*, 2019 WL 2023752, at *1, and Khalil cites nothing to suggest otherwise. For another, to the extent that the core purpose of Justice Kennedy's exceptions is to "prevent the Kafkaesque specter of supplicants wandering endlessly from one jurisdiction to another in search of a proper forum," *Eisel v. Sec. of the Army*, 477 F.2d 1251, 1258 (D.C. Cir. 1973), that purpose is not served where, as here, the Government truthfully disclosed the petitioner's whereabouts within hours (on a Sunday no less) and the transfers concluded in short order. The absence of the gamesmanship with which Justice Kennedy was concerned is only underscored by the fact that, "[a]ccording to the copy of the [Notice to Appear] that Mr. Khalil's Counsel received on March 11, ICE was already preparing to transfer Mr. Khalil to the Central Louisiana ICE Processing Center while he was still detained at 26 Federal Plaza a few hours

22

after his arrest." Petition ¶ 56 n.17.  In short, the full record does not support the idea that "the government played forum games or kept moving [Khalil] so that his filing could not catch up." *Griffin v. Ebbert*, 751 F.3d 288, 290 & n.2 (5th Cir. 2014) (citing *Padilla*, 542 U.S. at 454 (Kennedy, J., concurring)).

Khalil is arguably on firmer ground in seeking to avail himself of Justice Kennedy's second proposed exception — for when "the Government was not forthcoming with respect to the identity of the custodian and the place of detention," *Padilla*, 542 U.S. at 454 (Kennedy, J., concurring) — if only because the exception does not appear to require any showing of improper purpose.  But here too, his arguments fall short.  Once again, the relevant question is whether the Government was insufficiently forthcoming as to Khalil's detention *in New Jersey*.  It was not. At the moment of arrest, the Government truthfully informed Khalil's wife and his attorney that he was being taken to 26 Federal Plaza.  *See* Petition ¶¶ 51, 53.  Between then and the moment the Petition was filed, Khalil's attorney never asked a Government official for additional information about Khalil's whereabouts.  Instead, she relied on ICE's online Detainee Locator, which did not reflect Khalil's transfer from New York to New Jersey for a period of approximately six hours.  *See* Petition ¶ 55; *see also* Mar. 17, 2025 Joyce Decl., ¶ 16.  But those hours were in the middle of the night on a weekend when, as noted, Khalil's lawyer could not even have obtained the relief that he later sought.  Thus, assuming for the sake of argument that the Government was in some way not "forthcoming," as Justice Kennedy used that term, it did nothing to materially frustrate Khalil's access to the Great Writ.

Moreover, the one-time overnight delay in updating the online Detainee Locator, without more, is not enough to support an "inference of Government secrecy."  *Padilla*, 542 U.S. at 450 n.17.  Although not cited by either party here, ICE's own policies require only that it notify a detainee's lawyer "as soon as practicable on the day of transfer" and "in no circumstances later

than twenty-four (24) hours after the transfer occurs." U.S. ICE, Policy No. 11022.1(5.3)(2)(a) (2012); *see also Sow*, 2019 WL 2023752, at *5 (holding that Justice Kennedy's exception did not apply even where ICE failed to provide notice within twenty-four hours because "there is no allegation that the Government refused to tell [the petitioner's] lawyer where he had been taken" (cleaned up)). And the reality is that "the Government often repeatedly moves ICE detainees to remote locations . . . without informing counsel of the transfer or updating the ICE detainee locator." *Anariba*, 17 F.4th at 448 (internal quotation marks omitted). Plainly, therefore, this is not the exceptional scenario Justice Kennedy imagined, in which "the Government had removed [its detainee] from the Southern District of New York but refused to tell his lawyer where he had been taken." *Padilla*, 542 U.S. at 454 (Kennedy, J., concurring). To the contrary, when Khalil's attorneys next requested information from the Government about his whereabouts on the afternoon of March 9, 2025, they received prompt and accurate replies. *See* Petition ¶ 56.

In short, even if Justice Kennedy's proposed exceptions were good law (or the Court were inclined to adopt them by itself), they would not support Khalil's argument that this Court may entertain his claims. It follows that the district-of-confinement and the immediate-custodian rules apply and that Khalil's Petition is not properly before this Court.[6]

---

[6]    Khalil argues that the Court should allow him "to conduct limited and expedited jurisdictional discovery" in the event that it is "not persuaded to deny the government's motion" to dismiss or transfer. Pet.'s Opp'n 17. But "a habeas petitioner, unlike the usual civil litigant in federal court, is not entitled to discovery as a matter of ordinary course." *Bracy v. Gramley*, 520 U.S. 899, 904 (1997). And discovery here is not warranted because, as noted above, the facts relevant to the limited questions currently facing the Court — most notably, that Khalil was detained in the District of New Jersey when his lawyer filed the Petition — are not in dispute. If the Court were inclined to accept the Government's argument for transfer to the Western District of Louisiana, perhaps the case for jurisdictional discovery would be stronger given Khalil's insinuation that the White House was directly involved in the plan to move him there, *see* Petition ¶ 58; *see also* Pet.'s Opp'n 11, and the fact that, in the space of less than twenty-four hours, the Government hauled Khalil through at least six different districts (one likely twice): the Southern District of New York, the District of New Jersey, the Eastern District of New York, the Northern District of Texas, the Central District of Louisiana, and the Western District of

**B.  The Case Must Be Transferred to the District of New Jersey**

That is not the end of the analysis.  Instead, the lack of habeas jurisdiction in this District raises the questions of whether the Court should dismiss the case or transfer it to another district and, if the latter, to which district the case should be transferred.  The Government argues that the Court should dismiss the case or, in the alternative, transfer it to the Western District of Louisiana on the theory that the Western District of Louisiana is the district in which Khalil is presently confined and, thus, the only district in which he could now bring his claims (at least to the extent they are "core" claims).  ECF No. 31 ("Gov't Mem."), at 9.  Khalil, on the other hand, opposes dismissal and argues that transfer to the District of New Jersey is appropriate.  Pet.'s Opp'n 19.  The Court agrees with Khalil.

For starters, it is important to note that the district-of-confinement and immediate-custodian rules are "not jurisdictional in the sense of a limitation on subject-matter jurisdiction," *Skaftouros v. United States*, 667 F.3d 144, 146 n.1 (2d Cir. 2011) (internal quotation marks omitted), but rather akin to "personal jurisdiction or venue rules," *Gooden v. Gonzales*, 162 Fed. App'x 28, 29 (2d Cir. 2005) (summary order); *see also Rivera-Perez v. Stover*, — F. Supp. 3d — , No. 23-CV-1348 (SRU), 2024 WL 4819250, at *5 (D. Conn. Nov. 18, 2024) (noting that courts have construed the immediate-custodian rule to raise questions of venue or personal jurisdiction, not subject-matter jurisdiction); *see generally Padilla*, 542 U.S. at 434 n.7 ("The word 'jurisdiction,' of course, is capable of different interpretations.  We use it in the sense that it is used in the habeas statute, 28 U.S.C. § 2241(a), and not in the sense of subject-matter jurisdiction of the District Court.").  That is significant because, if the Court lacked subject-matter jurisdiction, dismissal (albeit without prejudice) would likely be the proper result.  *See, e.g.*,

---

Louisiana.  But because, for the reasons discussed below, the Court rejects the Government's argument for transfer to Louisiana, it need not and does not address that question.

*Durant, Nichols, Houston, Hodgson & Cortese-Costa P.C. v. Dupont*, 565 F.3d 56, 62-63 (2d Cir. 2009); *Katz v. Donna Karan Co., L.L.C.*, 872 F.3d 114, 121 (2d Cir. 2017).[7]  But because the issue is one of either personal jurisdiction or venue, it is well established — and undisputed by the Government — that the Court has the discretion to transfer the case to another district rather than dismiss.  *See, e.g.*, *SongByrd*, 206 F.3d at 179 n.9; *see also* Gov't Reply 12.

In the circumstances presented here, there are at least three reasons to exercise that discretion.  First and foremost, as the Government acknowledges, a "prompt resolution" of this important case is "imperative."  Gov't Reply 14-15.  Requiring Khalil to refile his Petition (and his additional requests for relief, *see* ECF Nos. 11, 53, 66) would result in unnecessary delay.  Second, dismissal would prejudice Khalil in several important ways.  *See, e.g.*, *Cruz-Aguilera v. I.N.S.*, 245 F.3d 1070, 1074 (9th Cir. 2001) (considering "whether the failure to transfer would prejudice the litigant" in deciding between dismissal and transfer); *Liriano v. United States*, 95 F.3d 119, 122 (2d Cir. 1996) ("In determining whether a transfer is in the interest of justice, the equities of dismissing a claim when it could be transferred should be carefully weighed.").  Dismissal would mean vacatur of the temporary relief this Court granted to Khalil, *see* ECF No. 9, and would allow for Khalil's expedited removal from the country before his claims could even be adjudicated.  Requiring Khalil to refile his petition in the Western District of Louisiana (the only district in which a *new* petition could be filed) would also mean litigating far from his lawyers, from his eight-months-pregnant wife, and from the location where most (if not all) of the events relevant to his petition took place.  *See* ECF No. 11, at 1-3.  Finally, the record makes

---

[7]      That said, 28 U.S.C. § 1631 — which provides that, when a "court finds that there is a want of jurisdiction, the court shall, if it is in the interest of justice, transfer such action . . . to any other such court . . . in which the action or appeal could have been brought at the time it was filed" — would arguably provide a basis for the Court to transfer Khalil's petition even if the defect were one of subject-matter jurisdiction.  *See, e.g.*, *SongByrd, Inc. v. Est. of Grossman*, 206 F.3d 172, 179 n.9 (2d Cir. 2000).

plain that Khalil's lawyers filed the Petition in this District based on a good-faith and reasonable belief that he was then detained here.  Transfer is thus appropriate to ensure that Khalil is not "penalized by . . . 'time-consuming and justice-defeating technicalities.'"  *Goldlawr, Inc. v. Heiman*, 369 U.S. 463, 467 (1962); *see, e.g.*, *Liriano*, 95 F.3d at 122 (observing that the "good faith" filing of an action in an improper forum is a "[f]actor[] militating for a transfer" rather than dismissal).[8]

To which district, then, should the case be transferred?  To answer that question, the Court must look, in the first instance, to the statute — enacted by Congress in 1948 — that governs the transfer of a civil case from "a district in which is filed a case laying venue in the wrong . . . district."  28 U.S.C. § 1406(a); *see SongByrd, Inc.*, 206 F.3d at 179 n.9 (observing that "a district court lacking both personal jurisdiction and proper venue" may transfer a case pursuant to Section 1406(a) "to a district where both defects [are] avoided").  Curiously, the parties failed to cite, let alone discuss, Section 1406(a) in their initial briefs addressing whether and to where this case should be transferred.  In response to an Order from the Court directing them to do so, however, the parties both acknowledge (or, at least, do not dispute) the applicability of the statute.  *See* ECF No. 70, at 5; Gov't Reply 14; *see also* ECF No. 63.[9]  And in any event, cases in which district courts have relied on Section 1406(a) to transfer immigration habeas cases filed in the wrong district are legion.  *See, e.g.*, *Conlin v. United States*, No. 23-CV-3272 (LTS), 2024 WL 458285, at *2-3 (S.D.N.Y. Jan. 11, 2024); *Casiano v. N.Y. State Niagara*

---

[8]     Additionally, to the extent that this Court has jurisdiction to adjudicate any "non-core" claims raised in Khalil's petition, dismissal of the Petition in its entirety is plainly unwarranted.

[9]     It follows that the parties have forfeited any argument against application of Section 1406(a).  *See, e.g.*, *Whitehurst v. Staten Island Univ. Hosp.*, No. 18-CV-1090 (ARR), 2018 WL 11218905, at *2 (E.D.N.Y. July 24, 2018) ("An argument is waived or abandoned if a party fails to make it." (internal quotation marks omitted)).

*Cnty.*, No. 24-CV-3850 (LTS), 2024 WL 3318225, at *1 (S.D.N.Y. June 17, 2024); *Bynum v. N.J.*, No. 24-CV-618 (LTS), 2024 WL 1023210, at *1 (S.D.N.Y. Feb. 26, 2024); *Moussaoui v. Biden*, No. 25-CV-691 (JGK), 2025 WL 457804, at *2 (S.D.N.Y. Jan. 28, 2025); *Darboe v. Ahrendt*, 442 F. Supp. 3d 592, 596 (S.D.N.Y. 2020); *see also, e.g.*, *United States v. Posey*, No. 16-CR-87 (RJA), 2023 WL 7124522, at *2 (W.D.N.Y. Oct. 30, 2023) (noting a court's "broad discretion" under Section 1406(a) "to transfer a habeas case to the proper judicial district").

Section 1406(a) provides for transfer "to any district . . . in which [the case] *could have been brought*." *Id.* (emphasis added).  By its plain terms, therefore, the statute calls for transfer of Khalil's Petition to the District of New Jersey, the only district in which — due to the immediate-custodian and district-of-confinement rules — his "core" claims "could have been brought" at 4:40 a.m. on March 9, 2025.  *See, e.g.*, *Alvarado v. Gillis*, No. 22-CV-10082 (JLR) (KHP), 2023 WL 5417157 (S.D.N.Y. Aug. 3, 2023), *report and recommendation adopted,* 2023 WL 5396499 (S.D.N.Y. Aug. 22, 2023) (ordering transfer of an immigration habeas petition to the district where the petitioner was detained at the time of filing); *Ali v. DHS/ICE/Dep't of Justice*, No. 19-CV-8645 (LGS), 2020 WL 3057383, at *2 (S.D.N.Y. June 9, 2020) (same); *Persaud v. ICE*, No. 04-CV-282 (FB), 2004 WL 1936213, at *1 (E.D.N.Y. Aug. 31, 2004) ("Although petitioner is currently confined in Alabama, at the time that he filed this petition he was confined in the Western District of Louisiana.  Accordingly, the Court orders the petition to be transferred to the United States District Court for the Western District of Louisiana."); *cf. Fuentes v. Choate*, No. 24-CV-1377 (NYW), 2024 WL 2978285, at *10-11 (D. Colo. June 13, 2024) (observing that when transfer is necessary due to improper venue under *Padilla*, "many courts choose to transfer habeas cases" to the district where the action "could have been brought at the time it was filed or noticed").  Indeed, the Court cannot do otherwise because where, as here, "a federal statute covers the point in dispute," "that is the end of the matter; federal courts

28

are bound to apply rules enacted by Congress with respect to matters over which it has legislative power." *Stewart Org., Inc. v. Ricoh Corp.*, 487 U.S. 22, 27 (1988) (cleaned up).

Relying on *Padilla*, the Government argues instead for transfer to the Western District of Louisiana, Khalil's present district of confinement. The "proper course," it insists, is "to transfer this case to the Western District of Louisiana — *i.e.*, the only district where Khalil could refile a petition today . . . . Put simply, 'jurisdiction lies in only one district: the district of confinement.'" Gov't Mem. 10 (quoting *Padilla*, 542 U.S. at 443). In *Hoffman v. Blaski*, 363 U.S. 335, 342-43 (1960), however, the Supreme Court rejected a nearly identical argument with respect to 28 U.S.C. § 1404(a), which provides — in nearly identical language — for transfer of a civil case to another "district . . . where it might have been brought." There, the petitioners argued that "the phrase 'where it might have been brought' should be held to relate not only to the time of the bringing of the action, but also to the time of the transfer." *Id.* at 342. "We do not think," the Court declared, "the . . . phrase 'where it might have been brought' can be interpreted to mean . . . 'where it may now be *rebrought*, with defendants' consent.'" *Id.* (emphasis added). Section 1404(a) "is unambiguous, direct and clear, and . . . the unequivocal words of § 1404(a) and the legislative history establish that Congress indeed meant what it said." *Id.* (cleaned up). The same can be said for Section 1406(a).

*Padilla* does not affect that conclusion. To the contrary, it is fatal to the Government's argument because it dictates that, at "the time of the bringing of the action," *id.* at 342, habeas "jurisdiction lies in only one district: the district of confinement," *Padilla*, 542 U.S. at 443. At that time, of course, Khalil was confined in the District of New Jersey, not in the Western District of Louisiana. Moreover, to the extent that *Padilla* discusses the jurisdictional effect of prisoner relocation at all, it says that a prisoner's transfer after a petition is filed does not deprive a court that would otherwise have jurisdiction of the ability to adjudicate his petition. *See id.* at

441.  Finally, *Padilla* does not address the effect of Section 1406(a), the plain language of which is just as binding on courts as the plain language of the statute that the Supreme Court there applied.  The *Padilla* decision thus offers guidance about where a habeas petition is properly filed in the first instance, but it leaves open where a case should be transferred when, as here, a petition is filed in the wrong venue and the petitioner's present district of confinement differs from his district of confinement at the time of filing.

The Government's related argument that "the transfer statutes," including Sections 1404(a) and 1406(a), "do not independently vest courts with jurisdiction they would otherwise lack," Gov't Reply 14, suffers from a similar misunderstanding of *Padilla*.  No statute is required to "vest" the District of New Jersey with otherwise-absent jurisdiction because habeas jurisdiction is "not jurisdictional in the sense of a limitation on subject-matter jurisdiction." *Padilla*, 542 U.S. at 451 (Kennedy, J., concurring); *see also Skaftouros*, 667 F.3d at 146 n.1 (same).  And as the *Padilla* Court's discussion of *Endo* makes clear, the fact that a detainee has been transferred away from a district that otherwise has jurisdiction to hear his or her claims does not necessarily deprive that district of habeas jurisdiction.  *See Padilla*, 542 U.S. at 441.

In short, applying the plain language of Section 1406(a), the Court concludes that Khalil's "core" habeas claims — those seeking his release from detention — must be transferred to the District of New Jersey, the one and only district in which he could have filed them when he did.  As discussed above, that arguably includes all of Khalil's claims.  But to the extent that Khalil's Petition also includes "non-core" claims over which this Court would have jurisdiction, transfer of those claims to the District of New Jersey is also appropriate, albeit under Section 1404(a).  That statute authorizes transfer of a case "[f]or the convenience of parties and witnesses, in the interest of justice . . . to any [] district or division where it might have been brought."  28 U.S.C. § 1404(a).  In deciding whether transfer is warranted under Section 1404(a),

courts consider various factors, including "the convenience to parties," "the convenience to witnesses," "where the case can be tried more expeditiously and inexpensively," and "the interests of justice." *Pierce v. Coughlin*, 806 F. Supp. 426, 428 (S.D.N.Y. 1992) (internal quotation marks omitted). Applying those factors, courts have transferred cases when an "action raising identical issues is pending" in another district, *Williams v. City of New York*, No. 03-CV-5342 (RWS), 2006 WL 399456, at *1 (S.D.N.Y. Feb. 21, 2006), or when transfer is otherwise required of "some, but not all, of the . . . claims in a given case," *JM Smith Corp. v. AstraZeneca Pharms. L.P.*, No. 19-CV-7233 (CM), 2020 WL 4605241, at *9 (S.D.N.Y. Aug. 11, 2020); *see also Jewell v. Music Lifeboat*, 254 F. Supp. 3d 410, 415 (E.D.N.Y. 2017) ("Rather than continue the case piecemeal, I also transfer the remaining claims . . . pursuant to 28 U.S.C. § 1404(a).").

Here, the relevant factors counsel in favor of transferring any remaining claims over which this Court might have jurisdiction to the District of New Jersey. As the Court discussed above, Khalil's claims challenging the Secretary of State's determination that he is removable are inextricably intertwined with his "core" habeas claims. Given that Khalil must litigate his "core" claims in New Jersey, it would be both more "convenient" for all involved and "in the interests of justice" for the New Jersey court to resolve any "non-core" claims that he may bring as well. *See, e.g.*, *Convergence Technologies (USA), LLC v. Microloops Corp.*, 711 F. Supp. 2d 626, 642 (E.D. Va. 2010) ("It is well-settled that transfer under § 1404(a) is generally in the interest of justice if a decision not to transfer would lead to courts rendering inconsistent judgments on the same issue."); *Cont'l Grain Co. v. Barge FBL-585*, 364 U.S. 19, 26 (1960) ("To permit a situation in which two cases involving precisely the same issues are simultaneously pending in different District Courts leads to the wastefulness of time, energy and money that § 1404(a) was designed to prevent"). Accordingly, the Court concludes that — pursuant to Section 1406(a) or a combination of that statute and Section 1404(a) — transfer of

Khalil's entire Petition to the District of New Jersey is necessary and appropriate.

**CONCLUSION**

In sum, the Court DENIES the Government's motion to dismiss Khalil's Petition but GRANTS its motion to transfer, albeit to the District of New Jersey, not to the Western District of Louisiana.[10] That conclusion is compelled by well-established rules and principles that this Court is bound to follow. First, given the undisputed fact that Khalil was detained in the District of New Jersey at the time his lawyer filed the Petition, this Court lacks jurisdiction over most, if not all, of Khalil's claims. Second, given that the District of New Jersey is the one and only district in which Khalil could have filed his Petition when he did, the statutes that govern transfer of civil cases from one federal district court to another dictate that the case be sent there, not to the Western District of Louisiana. Put simply, the law precludes this Court from reaching the merits of Khalil's claims, as serious and important as they may be, and it mandates that the Court allow a tribunal with jurisdiction to take the matter up from here.

To be clear, "when an action is transferred, it remains what it was; all further proceedings in it are merely referred to another tribunal, leaving untouched whatever has been already done." *Magnetic Eng'g & Mfg. Co. v. Dings Mfg. Co.*, 178 F.2d 866, 868 (2d Cir. 1950). This transfer is no different. It will be up to the transferee court in New Jersey to consider not only Khalil's Petition, over which it alone has jurisdiction, but also the various motions that Khalil has filed to

---

[10]    Khalil's pro forma request for leave to amend his Petition in the event the Court concludes that it cannot be heard in this District, *see* Pet.'s Mem. 19-20, is denied. First, the defect in most, if not all, of Khalil's claims is substantive, so amendment would be futile. *See, e.g., Roundtree v. NYC*, No. 19-CV-2475 (JMF), 2021 WL 1667193, at *6 (S.D.N.Y. Apr. 28, 2021) (collecting cases). Second, Khalil does not suggest that he possesses any facts that could cure the jurisdictional problems with his Petition. *See, e.g., Clark v. Kitt*, No. 12-CV-8061 (CS), 2014 WL 4054284, at *15 (S.D.N.Y. Aug. 15, 2014) ("A plaintiff need not be given leave to amend if he fails to specify how amendment would cure the pleading deficiencies in his complaint."), *aff'd*, 619 F. App'x 34 (2d Cir. 2015) (summary order); *accord TechnoMarine SA v. Giftports, Inc.*, 758 F.3d 493, 505 (2d Cir. 2014).

date in connection with his Petition, namely his motion to move him from the Western District of Louisiana to a detention facility in this District (or perhaps now New Jersey), ECF No. 11; his motion for immediate release on bail, ECF No. 53; and his motion for preliminary injunctive relief, ECF No. 66.  To avoid any unnecessary delay, the briefing schedules in effect for those motions, *see* ECF Nos. 29, 43, shall remain in effect unless and until the transferee court orders otherwise.  And to ensure that Khalil gets an opportunity to have his Petition and these motions considered by a court in the normal course — and to preserve the status quo — the Court's March 10, 2025 Order barring the Government from removing him (to which the Government has never raised an objection and which the Government has not asked the Court to lift in the event of transfer) shall similarly remain in effect unless and until the transferee court orders otherwise.  *See, e.g.*, *Burke v. People*, No. CIV.A. 04-4404, 2004 WL 2381198, at *2 (E.D. Pa. Oct. 25, 2004) ("The court also ordered that the stay of removal remain in place until further order of the transferee court.").

The Clerk of Court is directed to terminate ECF No. 30 and to transfer this case to the United States District Court for the District of New Jersey.  Further, consistent with the Government's own request, the Clerk of Court is directed to do so immediately, without regard for Local Civil Rule 83.1, which provides that "the Clerk [of Court], unless otherwise ordered, shall upon the expiration of seven (7) days effectuate the transfer of the case to the transferee court."  *See* Gov't Mem. 9 n.3 ("Should the Court transfer the case, to minimize any delay in having the case heard in the proper forum, the government respectfully requests that the Court waive the seven-day waiting period contained in Local Civil Rule 83.1.").

SO ORDERED.

Dated: March 19, 2025
New York, New York

_____
JESSE M. FURMAN
United States District Judge